JOHN R. RALLS ET AL. V. PINK L. PARRISH.

No. 2401.  Decided May 29, 1912.

### 1.—Unincorporated Town.

The location of an unincorporated town is determined, not by the limits
of a plat showing the dedication of streets and alleys therefor, but by the
collection of inhabited houses and area appurtenant to them which constitute it.
(P. 259.)

### 2.—Same—Location of County Seat.

The county seat of a county having been fixed by an election for that
purpose at the unincorporated town of E, the location of the county seat
thereby was not determined by a plat of such town filed on the day preceding
such election and not known to the voters, but by the limits of the collection
of inhabitated houses which constituted it a town in fact at the time.   (Pp.
258-260.)

### 3—Same—Removal—Distance from County Seat.

Where any portion of an unincorporated town at which the county seat
had been located was situated within five miles of the geographical center
of the county (though the county court house and jail therein were outside
such limit) the county seat was within such five-mile radius in the contempla-
tion of article 811, Revised Statutes, 1895, requiring in such case two-thirds
of those voting on the subject to remove it to another town at an election held
for that purpose.   (Pp. 260, 261.)

### 4.—Same—Certificate of Land Commissioner.

The Commissioner of the General Land Office, on an election occurring for
the removal of a county seat, may, on notice from the county judge, issue a
valid certificate designating the center of the county from maps, surveys, and
data on file in his office, by authority of art. 813, Rev. Stats., though a previous
Commissioner had theretofore issued a certificate showing a different location
of such point.   (P. 261.)

### 5.—Same—Impeaching Certificate.

The certificate of the Land Commissioner showing the location of the
center of the county can not be impeached by showing that the work of
determining such point was done by an employe in his office (chief draughts-
man) whose conclusions the Commissioner accepted and certified.    It was
proper for him to do so, that being ministerial work which, like most done in
the office, was necessarily performed by subordinates under his direction.
(Pp. 261, 262.)

Questions certified from the Court of Civil Appeals, Seventh Dis-
trict, in an appeal from Crosby County.

*Cooper, Merrill & Lumpkin,* and *Fiset & McClendon,* for appel-
lant.—When the town of Emma was selected the county seat in 1891,
the boundaries of the town as they existed at that time became the
boundaries of the county seat.   Rev. Stats., art. 1140; Whittaker v.
Dillard, 81 Texas, 259; 11 Cyc., 366; 7 Am. & Eng. Enc. Law, 1012;

Ex Parte Towler, 48 Texas, 413; Conley v. Fleming, 14 Kans., 381; State v. Harvie, 36 Kans., 588; Marengo v. Matkins, 32 So., 669; Matkins v. Marengo, 34 So., 171; Allen v. Lyttle, 40 S. E., 238; Way v. Fox, 109 Iowa, 340; State v. Commissioners, 44 Kans., 186; State v. Stevens, 19 Pac., 365; DeKalb Co. v. Atlanta, 65 S. W., 72; In re Allison, 16 Am. St., 224, 10 L. R. A., 790; Coleman v. People, 42 Pac., 1041; People v. Commissioners, 2 Pac., 912; Fall River Co. v. Powell, 58 N. W., 7; Atty. Gen'l v. Canvassers, 31 N. W., 539; Babcock v. Hohn, 75 S. W., 93.

If as much as one-fourth of the original town plot of the town of Emma is within a radius of five miles from the center of the county as fixed by the last certificate, but the courthouse and jail without the five-mile radius, then the county seat is situated within five miles of the geographical center of Crosby County, within the meaning of Article 811, Sayles' Civil Statutes. Constitution of Texas, art. 9, sec. 2; Rev. Statutes, arts. 811 to 813; Caruthers v. State, 67 Texas, 139; State v. Alcorn, 78 Texas, 387; Whitaker v. Dillard, 81 Texas, 364; Railway Co. v. Wells, 62 N. E., 332; Middlesborrough v. Pineville, 98 S. W., 298; State v. Berard, 3 So., 463; State v. Berthe, 6 So., 531; Hennesy v. Savings & Loan Co., 55 S. W., 124; Bradford v. Robinson, 141 S. W., 769; Ellis v. State, 92 Tenn., 93; Wallace v. Stevens, 74 Texas, 560; In re Liquor Locations, 13 R. I., 736; Walker v. Railway Co., 3 Ad. & Ell., 954.

There having been one valid certificate properly issued, fixing the geographical center of the county and there being evidence showing that neither the location of the surveys in the county nor the boundaries of the county, had in the meantime been changed, a subsequent Land Commissioner could not issue a second valid certificate. Const., art. 9, sec. 2; Rev. Stats., art 813; Martin v. Abernathy, 136 S. W., 837; State v. King, 20 S. C., 524; People v. Chase, 144 N. Y., 482.

A certificate designating the geographical center of a county made and determined by another than the commissioner, or the acting commissioner, of the general land office is void.

The selection of the Commissioner of the General Land Office as the person authorized by law to determine the location of the geographical center of a county and make his certificate with reference thereto was a delegation to said Commissioner of a part of the political functions of the government; and, as such, constituted the Land Commissioner the trustee of a public trust which he is incapable of delegating legally to any other person. If such delegation of authority is not in the nature of a public trust, then it imposed a duty upon the Commissioner of the General Land Office, attaching to his official position, the performance of which duty necessarily involved, on the part of the Commissioner, the exercise of judgment and discretion, which judgment and discretion must be exercised by the Commissioner in person, and was not subject to delegation to a subordinate. Constitution, art. 9, sec. 2; Leon County v. Houston, 46 Texas, 575; Sawyer v. Milam County, 2 Posey, U. C., 640; Rev. Stats., arts, 811, 813, 2864-2883; De Poyster v. Baker, 89 Texas, 155; Kilgore v. Jackson, 118 S. W., 819; Caruthers v. State, 67

Texas, 139; Martin v. Abernathy, 136 S. W., 827; Atty. Gen. v. Jackson, 41 Am. St., 621; Ensign v. Kindred, 30 Atl., 274; Willock v. Wilson, 59 N. E., 757; I Greenleaf on Evidence, sec. 506; Lyon v. Jerome, 37 Am. Dec., 271; Hoger v. Sidebottom, 113 S. W., 870; Hunter v. Hemphill, 6 Mo., 106; Abrams v. Ervin, 9 Iowa, 87; People v. Chase, 144 N. Y., 482; Southerland v. Governor, 29 Mich., 320; Chapman v. Limerick, 56 Me., 390; Harrison v. Harwood, 31 Texas, 656; Barber Co. v. O'Brien, 107 S. W., 25; Walker v. Tarrant County, 20 Texas, 16; Ex Parte Towles, 48 Texas, 413; Morris v. Patchin, 25 N. Y., 394; Atty. Gen. v. Jochim, 99 Mich., 358; Meachem on Agency, secs. 184-197; Meachem on Public Officers, sec. 567; State v. Reber, 226 Mo., 229.

*Chas. Rogan, N. A. Rector, L. W. Dalton,* and *J. W. Burton,* for appellee.—The first question should be answered in the negative, for two reasons: First—A plat of naked blocks and lots cannot be called the county seat *unless the evidence particularly shows that the voters so intended;* and, in view of the court's finding of fact that the plat was filed only one day previous to the election in 1891, and their further finding that there *is no evidence to show that the voters even knew it was filed,* renders it impossible to find that the plat, as a matter of law, is the county seat. Second—When the question before the court is one of the removal of the county seat situated in an unincorporated town, the courthouse, jail and other property used in connection with the holding of the courts, etc., really constitute the county seat; or, at most, the territory included in the collection of houses in which the courthouse, jail, etc., are situated. Fall River v. Powell, 5 S. D., 53; State v. Baird, 79 Texas, 64; Milarkey v. Foster, 6 Oreg., 378; State v. Eidson, 76 Texas, 302; Lumber Co. v. Rostel, 121 Calif., 511; Territory v. Stewart, 23 Pac., 405; Reg. v. Cottle, 3 Eng. L. & E., 474; Whethered v. Boon, 17 Texas, 150; Skov v. Coffin, 137 S. W., 455; 9 Am. & Eng. Ency. (2nd ed.), 65; In re Allison, 22 Pac., 820; Christy v. Board, 66 Atl., 1073; Smith v. Board, 113 N. Y., 672; Ingles v. Straus, 21 S. E., 490; Way v. Fox, 109 Iowa, 340; Whitaker v. Dillard, 81 Texas, 359; Canek v. Skeen, Vir., 63 S. E., 11; Middleborough v. Pineville, 98 S. W., 299.

If as much as one-fourth of the original town plat of the town of Emma is within a radius of five miles from the center of the county as fixed by the last certificate, but the courthouse and jail being without the five-mile radius, then the county seat is situated more than five miles from such center. Sec. 2, acts 1875, p. 88; 8 Gammel, 460; art. 811, Rev. Stats., 1895; art 9, sec. 2, Texas Constitution. For definitions: Any dictionary or encyclopedia; Sturgeon v. Paris, 122 S. W., 967; Harvey v. McCrea, 4 How. Prac., 31; Walker v. L. & B. Ry. Co., 3 A. & E. (N. S.), 744; Cook v. Johnson, 44 Conn., 175; Preston v. Aetna L. Ins. Co., 193 N. W., 142; Wiener v. Zwieb, 141 S. W., 772. As to construction and interpretation of statutes: Sutherland on Statutory Construction, pp. 315, 316, 317; Dehanty v. District, 25 App. D. C., 434; Powell v. State, 39 So., 164; sec. 3, Final Title, Rev. Stats., 1895; art. 3268, Rev. Stats., 1895, secs. 1 and

6. As to construction and interpretation of constitutional provisions: Greencastle v. Black, 5 Ind., 570; 6 Am. & Eng. Ency. of Law (2nd ed.), page 921, note 3, page 924; Gibbons v. Ogden, 9 Wheat. (U. S.), 188; People v. N. Y., Cent. Ry. Co., 24 N. Y., 487; Newell v. People; 7 N. Y., 97; Beardston v. Virginia, 76 Ill., 34; Manly v. State, 7 Md., 135; Miller v. Dunn, 72 Calif., 465; State v. Mace, 5 Md., 348.

The constitution and legislature both contemplated that a certificate should be issued by the Commissioner as often as desired by the sovereign voters, provided the request therefor came through the proper channel. Art. 9, sec. 2, Constitution; sec. 2, Acts 1875, p. 88, 8 Gammel, 460; art. 813, Rev. Stats., 1895; Ralls v. Parrish, 133 S. W., 933; Martin v. Abernethy, 136 S. W., 827.

The certificate under the seal of the General Land Office, signed by the Commissioner of that office, imports verity, and the manner of its preparation can not in the absence of fraud be inquired into. Art. 9, sec. 2, Constitution; Rev. Stats., arts. 813, 2868, 2871, 2872; Ralls v. Parrish, 133 S. W., 933; Kilgore v. Jackson, 118 S. W., 819; Martin v. Abernethy, 136 S. W., 827.

Mr. Justice Dibrell delivered the opinion of the court.

Certified Question from the Court of Civil Appeals of the Seventh Supreme Judicial District of Texas, as follows:

"This is a contest over the removal of the county seat of Crosby County from the town of Emma to the town of Crosbyton.

"Prior to the year 1891, Estacado was the county seat of said county. During that year, by a valid election, the county seat was removed to Emma, which was a town plotted prior to said election, the plot covering practically all of survey No. 2, H. & O. B. R. R. Co. surveys in said county. On the 17th of September, 1910, another election was held in said county for the purpose of determining whether the county seat should be removed from Emma to the town of Crosbyton, or to the town of Ralls. No declaration of the result of the election was made until the 8th day of February, 1911, when Pink L. Parrish as County Judge and returning officer of the election, entered his order declaring the results of the election to have been in favor of the removal of the county seat from Emma to Crosbyton, basing his order upon his finding that according to the election returns Crosbyton had received 199 votes, Emma 120 votes and Ralls none, and upon his further finding that the town of Crosbyton is within five miles of the geographical center of Crosby County, and that the town of Emma is more than five miles from such center.

"On the 18th day of September, 1891, and prior to the election of 1891 above mentioned, the Commissioner of the General Land Office, in accordance with law, made his certificate, designating the center of Crosby County, which was duly placed of record in the office of the Clerk of Crosby County, and according to said certificate, all of the town of Emma was within five miles of the geographical center of said county and all of the town of Crosbyton without. Since the issuance and recording of the certificate, the outer boundaries have not been changed or modified.

"Thereafter the contestee, Parrish, on his request, procured from the Commissioner of the General Land Office on the 26th day of August, 1910, a new certificate as to the location of such geographical center, and according to said certificate, about one-fourth of the original town plot of the town of Emma is within five miles of the center of the county as fixed by said new certificate.

"It appeared by the uncontradicted testimony that practically all of the original town of Crosbyton will be included within a circumference described with a five mile radius from the center of the county as fixed by the last certificate and that about one-fourth of the original town plat of Emma will also be included. The courthouse in the town of Emma is constructed upon a block of land in the center of the original town plat and the jail very near to the courthouse, and both the jail and the courthouse under the last certificate will be beyond the limits of the circumference so described.

"Neither Emma nor Crosbyton up to the time of the election in 1910 had been incorporated as a city, town or village.

"Appellee contends that by county seat is meant the courthouse, jail and other public buildings of the county, while appellant contends that the county seat includes the entire town plot as it existed at the time said town was designated as the county seat. We have heretofore in a written opinion, reversed and rendered the cause, holding Emma to be the county seat upon the theory that part of the original town plot being included within a circle described with a five miles radius from the center as fixed by the last certificate, and all of the original town plat being included by the first certificate is in either event within the meaning of the law within five miles of the geographical center of the county, and that Crosbyton, having failed to receive two-thirds of the votes cast necessary to remove a county seat under such conditions, was erroneously declared to be the county seat. The town plat of Emma was recorded one day prior to the day of the first election, but there is no evidence to show that the voters knew it had been so recorded. We call your Honors' attention to the following authorities on the question of what is a county seat: Williams v. Reutzel, 60 Ark., 155; In re Allison, 13 Colo., 525, 10 L. R. A., 790, 16 Am. St., 224, 22 Pac., 820; Marengo County v. Matkin, 134 Ala., 275; and as to the location of Emma being within the five mile radius, we cite the case of Bradford v. Robinson, 141 S. W., 769, and we certify for your decision the following questions:

"(1) Does the original town plat of Emma as it existed at the time it became the county seat of Crosby County, in 1891, constitute the county seat?

"(2) If as much as ¼ of the original town plat of the town of Emma is within a radius of five miles from the center of the county as fixed by the last certificate, but the courthouse and jail being without the five mile radius, then is the county seat 'situated within five miles' of the geographical center of Crosby County within the meaning of Article 811, Sayles' Civil Statutes, or is it 'more than five miles' from such center?

"In view of the great interest involved and the extremely insistent motion for rehearing filed by appellee we deem it best to certify to

your Honors the foregoing questions for determination, since we are not all certain of the correctness of the position taken in our opinion.

"Should your Honors answer the first of the above questions in the negative, then we desire to submit for your determination further questions upon the following preliminary statement. The first certificate of the Land Commissioner, mentioned above, was issued by W. L. McGaughey; the then Land Commissioner. Without any knowledge of the previous issuance of said certificate, the present Commissioner Robison, upon the request of appellee, signed and issued the second certificate, and it appears from the undisputed testimony that the second certificate was not made out by the Commissioner, but by H. P. Hunnicutt, a draughtsman in the Land Office at Austin, and in preparing it it was not made 'from maps, surveys and other data on file in his office, but was determined solely from a map of Crosby County, bearing date November, 1900,' and upon this issue we propound the following questions:

"(3)   There having been one valid certificate, properly issued, fixing the geographical center of the county and there being evidence showing that neither the location of the surveys in the county nor the boundaries of the county had in the meantime been changed, could a subsequent Land Commissioner issue a second valid certificate?

"(4)   Under the Constitution and statutes requiring the Commissioner of the General Land Office to determine the geographical center of the county from maps, etc., in his office is such certificate prepared by the chief draughtsman and with which the Commissioner had no other connection than to sign it, valid?

"In relation to these questions we call your attention to the following authorities: Constitution, article 9, section 2; Leon County v. Houston, 46 Texas, 575; Revised Statutes, arts. 811, 813, 2864-2883; DePoyster v. Baker, 89 Texas, 155; Caruthers v. State, 67 Texas, 139; Kilgore v. Jackson, 55 Texas Civ. App., 99, 118 S. W., 819; Martin v. Abernethy, 136 S. W., 827."

1.   The statement in the beginning of the certificate would imply that the town of Emma had been platted and builded upon such plat for an indefinite period of time, but this idea is modified when considered in connection with the subsequent statement that the plat of the town of Emma was only filed for record the day before the election selecting such town as the county seat of Crosby County. It is evident from the facts upon which the certified question is based that prior to the removal of the county seat of Crosby County from the town of Estacado the town of Emma was established. The proposition submitted to the voters of Crosby County was whether or not the county seat of that county should be removed from the town of Estacado to some other place. The town of Emma was unincorporated, and hence prior to the election in 1891 had no defined boundaries. When reference was made to the town of Emma it could not, therefore, have been designated with reference to fixed and definite boundaries, but only as a town. The filing of the plat and the dedication of the streets and alleys and public square the day before the election could not have fixed the limit of the town of

Emma as within the contemplation of the voters. They had no knowledge of the plat and dedication, and hence they were voting for the removal of the county seat from the town of Estacado to the town of Emma in the sense and with the evident intent that such town was constituted by an aggregation of inhabited houses in close proximity to each other and the area appurtenant thereto. They were voting to locate the county seat at the old town of Emma and that intent must control. It was never contemplated and in the very nature of things could not have been contemplated that the unincorporated town of Emma embraced a section of uninhabited territory. As stated in the case of State v. Town of Baird, 79 Texas, 64: "A town may exist without being divided into lots; and on the other hand, neither naked lots, whether with or without a map, constitute a town. If the population extended beyond the platted portion of the town, such extension was properly embraced within the limits of the incorporation."

A plat and map of a town unincorporated is ineffectual on the one hand to extend the boundaries of such town beyond its habitation as evidenced by the collection of inhabited houses, and on the other hand to prescribe the limits of such town within the space of such plat and map where the collection of inhabited houses extend beyond the limits of such plat and map. This being true it is proper to say that the situs of an unincorporated town will not be controlled by the platted area of such town without reference to the collection of inhabited houses, which together with the area appurtenant to same in the ordinary signification of the meaning of the word constitute the town. This was clearly the holding in the case of the State v. Eidson, 76 Texas, 305, 7 L. R. A., 733, from which we quote the following: "No definition of the word 'town' is given, and it follows that we must take the word in its ordinary signification—a collection of inhabited houses. The term carries with it the idea of a considerable aggregation of people living in close proximity. A town population is distinguished from a rural population, which is understood to signify a people scattered over the country and engaged in agricultural pursuits or some similar association requiring a considerable area of territory for its support. A section of country so inhabited cannot be called a town, nor treated as a part of a town, without doing violence to the meaning ordinarily attached to that word."

A town may be such within the meaning of our Constitution and laws without being incorporated. Williams v. Willis, 84 Texas, 398; Hargadene v. Whitfield, 71 Texas, 482. Where a town is duly incorporated it is embraced within definite metes and bounds and without respect to an aggregation of inhabited houses, but where it is an unincorporated town its area is defined to be and to embrace the aggregation of inhabitants and the collection of occupied dwellings and other buildings constituting such town. Words & Phrases, vol. 8, p. 7020; Lumber & Mercantile Co. v. Rostel, 121 Cal., 511.

The intention of the voters at the time of selecting the county seat must control. We think the case of Falls River v. Powell, 5 S. D., 52, cited by learned counsel for appellee is directly in point, and, as

illustrative of the law as we understand it, we take from that case the following excerpt:

"It was not necessary that the 'place' selected as a county seat should have been platted at all. The selection, if in other respects legal, would have been good and operative if it had designated a certain quarter section of land, or 'John Smith's farm,' if there had been but one such in the county, and that a well known place. It is purely a question of what place the electors had in mind and intended to designate and select. If neither Petty nor any other owner had ever platted his land, the county seat would by such vote have been located at Hot Springs, provided there was such a place, whose situs or location could have been practically and reasonably fixed and determined. It was not essential that Hot Springs or Cascade, as candidates for county seat, should have fixed any definite exterior boundaries. The fact that, at the time of the election, a town of Hot Springs had been platted, whether such plat was regular or irregular, was only important as bearing upon the intention and understanding of the electors in designating Hot Springs as the place of their choice for county seat. Suppose it had been demonstrated on the trial that every elector who voted for Hot Springs did so having in mind and intending the locality formally and then known as Hot Springs and not the particular territory platted by Petty; would the law, on account of such plat, force the county seat into and within the limit of such plat? We think not. Under the evidence in this case, we think Hot Springs, either as a well known locality in the vicinity of the Springs, or as a platted town-site, was a place eligible for selection as a county seat; and which place is selected is a question, not of law, but of fact, depending upon the intention of the electors."

Upon the weight of authority and reason we answer the first question in the negative. The original town plat of Emma as it existed at the time it became the county seat of Crosby County in 1891, did not constitute the county seat, but rather the collection of inhabited houses and the area appurtenant to such houses constituted the town and therefore the county seat. The town of Emma as the voters knew it and as they intended it should constitute the county seat should control.

2. If any portion of the town of Emma, as that town was known and recognized at the time the proposed change of the county seat was ordered to be voted upon and as the voters intended it should constitute the county seat, independent of the plat and map referred to, is located within a radius of five miles of the geographical center of Crosby County, then the town of Emma, in contemplation of Article 811, Sayles Civil Statutes, is within such radius. Bradford v. Robison, 141 S. W., 769. Differently stated, it is not necessary that a county seat should be wholly within the radius of five miles of the geographical center of the county, but only partially so, in order to make applicable the two-thirds rule in removing such county seat. This is in harmony with the former holding of this court, which we think correct.

We have expressed fully our views on the question involved in the answer to the first interrogatory as to what constituted the town

of Emma at the time the county seat was located there, but it is not within our jurisdiction to determine the issue of fact as to what constitutes the boundaries of Emma applying the rule laid down as applicable thereto, and thereby determine whether any portion of the town is within the said radius. That is the duty of the Court of Civil Appeals.

We regret that in answering these questions it is impossible to be more definite. This results either from an existing condition or from an imperfect record. The certificate is silent as to the condition of the town of Emma prior to the filing of the map and plat on October 13, 1891, and we are left in doubt as to whether there was prior to that time any plat of the town showing the streets and the area embraced within the town.

3. We think the Commissioner of the General Land Office may issue a subsequent valid certificate showing the geographical center of the county whenever any election for a county seat is ordered. The statute so declares. Article 813 of the Revised Civil Statutes contemplates that the Commissioner of the General Land Office, upon notice by the County Judge of any county that a proposition is submitted to the people of such county, or that it is desirable on the part of the people thereof, that the center of such county should be designated preliminary to the removal or location of any county seat, shall, from the maps, surveys and other data on file in his office, designate the center of such county, and certify the same to the County Judge. Such certificate is designed to serve in such election as evidence of the geographical center of the county, and may not be impeached except upon grounds of fraud or such gross mistake as would in law be equivalent to actual fraud. Such certificate was not intended to serve as evidence indefinitely. It might be competent evidence in a subsequent election if there was no contest or issue as to where the geographical center was, but the voters at each county seat contest are entitled to know from such certificate made at the time of the election as to the location of the geographical center of the county. Parrish v. Ralls, 133 S. W., 933; Martin v. Abernathy, 136 S. W., 827.

4. We are aware of no law that requires the Commissioner of the General Land Office personally to perform the manual work necessary to determine the geographical center of the county when called upon to furnish such certificate. If it is done under his supervision, or by some one employed by him, it is sufficient, provided the certificate purports to be his act. This is the method of performing the great bulk of the business of his office, and without which it would be impossible to maintain the office. While the Commissioner of the General Land Office is, properly speaking, an executive officer, yet many of the duties imposed upon him by law are ministerial. Giving the certificate of the geographical center of a county is a ministerial act in the same sense that the issuance of a patent is ministerial. In determining the geographical center of a county the law provides the method of determining it as it does in the issuance of a patent. Before a patent can issue the Commissioner must determine a number of things as preliminary. As stated by Judge Wheeler in the case of Commissioner of the Land Office v. Smith, 5 Texas, 479: "There are

various duties assigned by law to the Commissioner of the General Land Office to be performed before the patent can issue. He must pass upon the validity of the certificate and the survey; he must determine whether both are of such a character as, under the law, to entitle the party to a patent; he must also determine whether the land sought to be conveyed was vacant when located or was appropriated by any previous claim, which he is required by law to respect. When these and such other questions as may address themselves to the Commissioner under the laws prescribing his official duties, shall have been resolved in favor of the applicant, his right to his patent is clear and indisputable. The issuing of the patent becomes a mere ministerial act involving no exercise of judgment, and one which the Commissioner has no discretion to refuse.''

What was there said in regard to the Commissioner's duties as they relate to the issuance of patents is applicable to the issuance of the certificate in question. It would be regarded as absurd to contend that the law requires the Commissioner to perform personally all the detail work pertaining to the issuance of patents, and where he has issued the patent as evidenced by his signature and approval, it becomes his act in contemplation of law. This is equally true of the issuance of the certificate in question. The inquiry as to whether the work of assembling the data and fixing the geographical center was performed in person by the Commissioner or by an employe was wholly irrelevant and should not have been permitted.